09-0547-cv
Freedom Holdings, Inc. v. Cuomo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2009

(Argued: December 2, 2009　　　　　　　Decided: October 18, 2010)

Docket No. 09-0547-cv

————————————

FREEDOM HOLDINGS, INC., INTERNATIONAL TOBACCO PARTNERS, LTD., 1010 Northern Boulevard, Suite 208, Great Neck, NY 11021, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

—v.—

ANDREW M. CUOMO, in his official capacity as Attorney General of the State of New York, ROBERT L. MEGNA, in his official capacity as Commissioner of Taxation and Finance of the State of New York,

*Defendants-Appellees*.

————————————

Before:

WALKER, RAGGI, *Circuit Judges*, and RAKOFF, *District Judge.*[*]

————————————

Appeal from a judgment of the United States District Court for the Southern District

of New York (Alvin K. Hellerstein, *Judge*), entered after a bench trial, which rejected

———————

[*] District Judge Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

plaintiffs' Sherman Act and Commerce Clause challenges to New York's Escrow and Contraband Statutes, enacted in furtherance of a 1998 Master Settlement Agreement ("MSA") between cigarette manufacturers and all but four states.

AFFIRMED.

---

DAVID F. DOBBINS (Nicolas Commandeur, Mark G. Young, *on the brief*), Patterson Belknap Webb & Tyler LLP, New York, New York, *for Plaintiffs-Appellants*.

SASHA SAMBERG-CHAMPION, Assistant Solicitor General (Barbara D. Underwood, Solicitor General; Benjamin N. Gutman, Deputy Solicitor General; Monica Wagner, Steven C. Wu, Assistant Solicitors General, *on the brief*), *for* Andrew M. Cuomo, Attorney General of the State of New York, *for Defendants-Appellees*.

---

REENA RAGGI, *Circuit Judge*:

Plaintiffs Freedom Holdings, Inc., and International Tobacco Partners, Ltd., are cigarette importers. They filed this putative class action in the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *Judge*) to enjoin the enforcement of New York statutes enacted in furtherance of a 1998 Master Settlement Agreement ("MSA") between a number of tobacco companies and various government entities, including New York State. Plaintiffs contend that the laws at issue, N.Y. Pub. Health Law §§ 1399-nn–1399-pp (the "Escrow Statute"), and N.Y. Tax Law §§ 480-b, 481, and 1846 (collectively, the "Contraband Statute"), impermissibly (1) restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) regulate out-of-state

2

commerce in violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. Plaintiffs now appeal from a judgment entered in favor of defendants on January 14, 2009, after a bench trial. For the reasons stated in this opinion, we affirm.

## I.   Background

Numerous prior opinions of this court and the district court detail the extensive background of this case. See Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings I"), 357 F.3d 205 (2d Cir. 2004); Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings II"), 363 F.3d 149 (2d Cir. 2004); Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings III"), 447 F. Supp. 2d 230 (S.D.N.Y. 2004); Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings IV"), No. 02 Civ. 2939, 2004 WL 2251668 (S.D.N.Y. Oct. 6, 2004); Freedom Holdings, Inc. v. Spitzer ("Freedom Holdings V"), 408 F.3d 112, 115 (2d Cir. 2005); Freedom Holdings, Inc. v. Cuomo ("Freedom Holdings VI"), 592 F. Supp. 2d 684 (S.D.N.Y. 2009). We assume familiarity with these opinions and recite only the facts relevant to the decision reached today.

### A.   The Master Settlement Agreement

In November 1998, the nation's four dominant cigarette manufacturers – Philip Morris, Lorillard Tobacco, Brown & Williamson, and R.J. Reynolds[1] – settled pending

---

[1] Brown & Williamson and R.J. Reynolds have since merged, forming Reynolds American, Inc.

litigation with forty-six states,[2] the District of Columbia, and five United States territories (collectively, "the states") by entering into the MSA. In return for releases from liability, these manufacturers agreed to make substantial annual payments to compensate the states for health care expenses incurred in the past and expected to be incurred in the future as a result of their populations' smoking-related ailments. New York's approval of the MSA is reflected in State v. Philip Morris, Inc., 179 Misc. 2d 435, 686 N.Y.S.2d 564 (Sup. Ct. N.Y. Co. 1998), aff'd, 263 A.D.2d 400, 693 N.Y.S.2d 36 (1st Dep't 1999).

### 1. The MSA's Treatment of Cigarette Manufacturers

The MSA divides cigarette manufacturers into several groups. The first group consists of the four dominant manufacturers who initially executed the MSA. They are referred to as "original participating manufacturers," or "OPMs." The second group consists of more than fifty smaller manufacturers who joined the MSA after its initial execution. They are referred to as "subsequent participating manufacturers," or "SPMs." The SPMs are divided into two sub-groups: "grandfathered SPMs," who joined the MSA within sixty days of the initial November 1998 execution date;[3] and "non-grandfathered SPMs," who joined the MSA thereafter. A third group consists of manufacturers who have not joined the MSA. They are referred to as "non-participating manufacturers," or "NPMs." An NPM may become a non-grandfathered SPM at any time by signing the MSA and making prescribed

---

[2] Four states – Florida, Minnesota, Mississippi, and Texas – settled litigation with the tobacco companies before the MSA was executed in 1998.

[3] By agreement of the parties, this sixty-day period was later expanded to ninety days.

4

payments.

2.      Payment Obligations

The MSA specifies a total base payment to be made by all OPMs to the states each year. In 2009, the required base payment was $9 billion. The MSA allocates the annual base payment obligation among OPMs according to their relative market share of the total number of individual cigarettes shipped by the OPMs to the fifty states, the District of Columbia, and Puerto Rico during the preceding calendar year. The MSA then awards the base payment to the states based on prescribed allocable shares, which for New York is 12.76%.

SPMs make annual payments approximating payments made by OPMs. The advantage conferred on grandfathered SPMs for quickly joining in the MSA is that they are exempted from payments on either their 1998 market share, or 125% of their 1997 market share, whichever is greater. Thus, grandfathered SPMs pay an amount approximating the OPM payment only for each cigarette manufactured above the grandfathered threshold.

While the average per-cigarette cost of complying with the MSA is roughly equivalent among OPMs and SPMs above grandfathered thresholds, this court and the district court have observed that the SPM payment formula may, as an arithmetical matter, disproportionately increase marginal payment obligations when SPMs gain market share from OPMs. See Freedom Holdings II, 363 F.3d at 153; see also Freedom Holdings VI, 592 F. Supp. 2d at 698 n.15; Freedom Holdings III, 447 F. Supp. 2d at 258. In this case, we need not consider whether this formula raises antitrust concerns because plaintiffs are NPMs, not SPMs. See infra at **[22-24 & n.14]**.

5

### 3. Adjustments to Payment Obligations

The MSA also provides for various adjustments to participating manufacturers' payment obligations. First, an "inflation adjustment" increases payment obligations by a minimum of 3% annually. Second, a "volume adjustment" reduces the required base payment if there is an overall decline in the volume of cigarettes sold nationwide. Third, if participating manufacturers lose market share relative to NPMs, an "NPM adjustment" reduces the required base payment by triple the amount of market share lost. See MSA § IX(d)(1)(A).[4]

## B. The Challenged Statutes

### 1. The Escrow Statute

Under the MSA, a decline in the volume of sales by participating members necessarily decreases the payments received by the states. To the extent the decline is attributable to increased sales by NPMs, states can both make up for the lost MSA payments and avoid the NPM adjustment by enacting and diligently enforcing escrow statutes. See MSA § IX(d)(2)(B). The MSA contemplates that an escrow statute will "effectively and fully neutralize[] the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of [the MSA]." Id. § IX(d)(2)(E).

---

[4] If participating manufacturers lose more than 16-2/3% in market share, the decrease in payment obligations is calculated "by a complex formula potentially increasing the [participating manufacturers'] discount." Freedom Holdings III, 447 F. Supp. 2d at 236.

The settling states have, in fact, all enacted escrow statutes. The operative section of the New York Escrow Statute challenged in this case is codified at New York Public Health Law § 1399-pp. It requires each cigarette manufacturer either (1) to join the MSA as a participating manufacturer, see id. § 1399-pp(1); or (2) to make annual payments into a state escrow fund, see id. § 1399-pp(2). The statute specifies the amount of these annual escrow payments, which are adjusted for inflation. See id. at § 1399-pp(2)(a). Escrow funds are released if needed to pay certain judgments, to the extent an NPM paid more into the escrow fund than it would have paid as an SPM, or otherwise after twenty-five years. See id. § 1399-pp(2)(b).

As originally drafted, state escrow statutes, including New York's, also contained allocable share release provisions, which allowed an NPM to recoup escrow payments to the extent the NPM paid more into the escrow fund than a state's allocable share of MSA payments. This provided an incentive for NPMs to concentrate their sales in a single state or small group of states to minimize their escrow costs. Thus, an NPM that sold 100% of its cigarettes in New York could recoup 87.24% of its escrow payments because New York's allocable share of MSA payments is 12.76%. Meanwhile an NPM that sold the same number of cigarettes nationwide could recoup none of its escrow payments. To avoid this outcome, in 2003, New York, like other settling states, amended its Escrow Statute to permit NPMs to obtain a release of escrow payments only to the extent they exceeded the per-cigarette payments the NPMs would have made as participants in the MSA. See N.Y. Pub. Health

7

Law § 1399-pp(2)(b)(ii).[5]

### 2. The Contraband Statute

Between 1998 and 2002, MSA participants saw their market share of cigarette sales decline while NPMs' share rose. Attributing this situation, at least in part, to the failure of certain NPMs to comply with escrow statutes, a number of states enacted "contraband statutes."[6] See Freedom Holdings I, 357 F.3d at 213 (quoting Governor George Pataki's statement that New York's Contraband Statute would "bolster the State's ability to diligently enforce" the Escrow Statute and, thus, "help protect the State from further [NPM] adjustments" (internal quotation marks omitted) (alteration in original)). New York's Contraband Statute, codified at New York Tax Law §§ 480-b, 481(1)(c), and 1846, requires a tobacco manufacturer to certify annually either (1) that it is a participating manufacturer,

---

[5] This amendment to the Escrow Statute states:

> [T]o the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the master settlement agreement payments, as determined pursuant to section IX(i) of the master settlement agreement including after final determination of all adjustments, that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer."

N.Y. Pub. Health Law § 1399-pp(2)(b)(ii) (emphasis added).

[6] Defendants suggest that these laws are "generally known as the directory statutes but referred to by plaintiffs as Contraband Statutes." Appellees' Br. at 9. For the sake of consistency with prior opinions in this case, we use the term "Contraband Statute" to refer to the challenged provisions of the New York Tax Law.

or (2) that it has complied with the Escrow Statute. See id. § 480-b(1). New York agents cannot affix tax stamps to cigarettes if the manufacturer has not made the required certification. See id. § 480-b(2). Cigarettes that do not bear a tax stamp are subject to seizure or forfeiture, see id. § 1846, and a civil penalty of up to $5,000 may be assessed on the non-compliant manufacturer, see id. § 481(1)(c).

C.     Prior Proceedings

1.     *Freedom Holdings I*

On April 16, 2002, plaintiffs commenced this action in the Southern District of New York, alleging that New York's Contraband Statute violated the Sherman Act, the Commerce Clause, and the Fourteenth Amendment. The district court dismissed the complaint for failure to state a claim, and plaintiffs appealed to this court.

We affirmed dismissal of the Commerce Clause claim, concluding that the Contraband Statute did not discriminate against out-of-state economic interests, burden interstate commerce, or regulate commerce occurring outside New York, as plaintiffs alleged. See Freedom Holdings I, 357 F.3d at 217-21.[7] Noting deficiencies in plaintiffs' Fourteenth Amendment equal protection claim, we remanded to the district court, so that plaintiffs could have an opportunity to amend their complaint. See id. at 235.[8]

---

[7] In so doing, we reserved a question not raised by plaintiffs' complaint: whether "any sort of interstate regulatory gridlock would occur if many or every state adopted similar legislation." Freedom Holdings I, 357 F.3d at 221 (internal quotation marks omitted).

[8] In Grand River Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158 (2d Cir. 2005), we held that the equal protection argument raised by a similar group of NPM plaintiffs was

At the same time, we reversed the dismissal of plaintiffs' antitrust claim, applying a two-step analysis that asked, (1) whether the Contraband Statute effected a per se violation of the Sherman Act and, if so, (2) whether it was nevertheless saved by the doctrine of state action immunity. Accepting plaintiffs' allegations as true, as we were required to do in reviewing a judgment of dismissal, we observed that the Contraband Statute "allegedly enforce[s] an express market-sharing agreement among private tobacco manufacturers, the MSA." Id. at 224. We determined that plaintiffs pleaded both market division and price fixing to the extent "market-share increases among manufacturers are substantially 'penalized'" by the MSA. Id. at 225. Thus, we concluded that plaintiffs adequately stated an antitrust claim by alleging that "the combination of the MSA, the Escrow Statutes, and the Contraband Statutes, allows OPMs to set supracompetitive prices that effectively cause other manufacturers either to charge similar prices or to cease selling." Id. at 226.

We next considered whether the doctrine of state action immunity shielded the Contraband Statute from application of the antitrust laws. See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980). Although we were satisfied that the MSA regime was "clearly articulated and affirmatively expressed as state policy," the first prerequisite for state action immunity, Freedom Holdings I, 357 F.3d at 226-27, we concluded that the complexity of the MSA scheme precluded determination at the

---

"unavailing because the Escrow Statutes are rationally related to a legitimate state interest: promoting public health and recovering the costs of tobacco-related illnesses," id. at 175. Plaintiffs have not pursued their equal protection claim either on remand or in this court.

10

dismissal stage as to whether the state was motivated by legitimate policy goals or by an impermissible desire to share in monopoly profits, see id. at 227-31. We concluded further that the state was not entitled to immunity at the pleading stage because it had yet to make the required evidentiary showing that it actively supervised pricing decisions made by cigarette manufacturers participating in the MSA. See id. at 231-32.

### 2. *Freedom Holdings II*

In response to defendants' petition for rehearing, we issued a second opinion expanding on our reasons for reversing dismissal. See Freedom Holdings II, 363 F.3d 149. First, we observed that "[a]ccording to the complaint, the function of the Escrow Statute is to coerce NPMs to join the MSA because the costs of compliance with the Escrow Statute are substantially higher than the costs of being an SPM." Id. at 152; see also id. at 154.

Second, we identified the core aspect of the alleged market division as the SPM pricing formula. Parsing that formula, we noted that it was possible that SPMs were penalized for gaining market share from OPMs because, "under the MSA, if the numerator increases because the SPM has taken market share from an OPM, the denominator decreases by the amount of the increase. Thus, the SPM's proportion of the annual payment increases by more than its proportion of overall market share." Id. at 153. We, therefore, rejected defendants' contention that, as a matter of law, an SPM's marginal payment per cigarette is always lower than an OPM's per-cigarette payment, and we concluded that plaintiffs should be afforded an opportunity to prove that "payments increase disproportionately (i.e. in more than a 1 to 1 ratio) when market share increases." Id.

11

Third, as to state action immunity, we reiterated that, as alleged in the complaint, the Contraband Statute was subject to the two-part analysis of California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 105, because NPMs are "forced . . . to become part of the market-sharing agreement set up by the MSA," Freedom Holdings II, 363 F.3d at 154. Thus, "the Challenged Statutes have the effect, according to the allegations of the complaint, of delegating price-setting authority to the OPMs." Id. at 155. In any event, it was "too soon to say whether the state will ultimately be able to elicit evidence sufficient to meet" the second, active supervision, prong of Midcal analysis. Id. at 157.

3.  *Freedom Holdings III, IV*, and *V*

On remand after our decisions in Freedom Holdings I and Freedom Holdings II, plaintiffs amended their complaint and moved for a preliminary injunction barring enforcement of New York's Escrow and Contraband Statutes. On September 14, 2004, the district court preliminarily enjoined enforcement of the Escrow Statute's allocable share release amendment, but it denied the motion in all other respects, see Freedom Holdings III, 447 F. Supp. 2d at 233, thereafter also denying rehearing, see Freedom Holdings IV, 2004 WL 2251668. Plaintiffs appealed, and we affirmed the denial of broader injunctive relief because plaintiffs failed to demonstrate the requisite likely irreparable harm. See Freedom Holdings V, 408 F.3d at 115. We did not discuss the likelihood of plaintiffs' success on the merits.

4.  *Grand River*

In Grand River Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158 (2d Cir. 2005),

12

we considered a second Commerce Clause challenge to the MSA. The Grand River plaintiffs alleged that New York's Escrow and Contraband Statutes effectively "force out-of-state merchants to seek New York regulatory approval before undertaking an out-of-state transaction, [and] that . . . interstate regulatory gridlock would occur if many or every state adopted similar legislation." Id. at 171 (quoting Freedom Holdings I, 357 F.3d at 221 (internal quotation marks omitted)). Taking "no position as to the ultimate viability" of this contention, we concluded that the pleading should not have been dismissed as a matter of law because the Grand River plaintiffs "stated a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." Id. at 173.

D.      *Freedom Holdings VI*: The Challenged Judgment

On February 10, 2006, plaintiffs again amended their complaint to add a Commerce Clause claim conforming to Grand River. After discovery closed, the district court commenced a three-day hearing on November 18, 2008, after which it entered judgment for defendants as if after a bench trial pursuant to Federal Rule of Civil Procedure 52. See Freedom Holdings VI, 592 F. Supp. 2d 684.

1.      Findings of Fact

Relying on data compiled by Pricewaterhouse Coopers in the course of its duties as the independent auditor responsible for calculating payment obligations and reporting data to the states and participating manufacturers under the MSA, the district court made a

13

number of findings, including the following:

First, "the payment structure of the MSA does not favor the major cigarette companies over" SPMs and NPMs. Id. at 691. "[U]pdated reports reveal[ed]" that "OPMs continue to pay more per carton ($5.31 in 2007), including payments to the four previously settled states, than do the non-grandfathered SPMs ($5.07), and both pay more than NPMs pay under the Escrow Statutes ($5.02)." Id. While "[g]randfathered SPMs, viewed in isolation, have the lowest average payment obligation ($2.63), since they pay nothing for cigarettes sold up to their grandfathered threshold," id., credible expert testimony indicated that marginal cost, not average cost, determined price, see id. at 698. The marginal cost for cigarette sales above the grandfathered threshold was "about what non-grandfathered SPMs pay ($5.07), which is more than NPMs pay." Id. at 691.

Second, NPMs had not "suffered," but rather "prospered," under the combined effect of the MSA and challenged state statutes. Id. at 697. Specifically, while OPMs' total market share declined from 97.1% to 85.9% between 1997 and 2007, NPM market share during that same period increased "from 0.4% in 1997 to a peak of 8.1% in 2003, . . . to 5.4% in 2007." Id. at 691.[9] The "figures" cited in these two groups of findings "undermine" defendants'

---

[9] The district court found the decline in market share between 2003 and 2007 explained by the fact that "General Tobacco, the largest NPM to become a non-grandfathered SPM, joined the MSA in July 2004, which accounts for the fact that the SPMs' total market share has expanded slightly at the NPMs' expense in the years since." Freedom Holdings VI, 592 F. Supp. 2d at 691 n.5. Further, the court observed that the data supplied by Pricewaterhouse Coopers likely "understate[d] NPM sales because many NPMs sell cigarettes through the Internet or Indian reservations to avoid federal excise tax collection," which sales the accounting firm does not consider in identifying market shares. Id. at 692.

argument "that 'NPMs are deterred from seeking increased market share because the high costs of compliance with the Escrow Statute preclude their competing through lower prices.'" Id. at 697. Indeed, this conclusion obtained even if plaintiffs had proved – which they did not – that the MSA discouraged competition among OPMs. The evidence showed not only that NPMs could exploit disproportionate price increases by MSA participants, but that they "have done so vigorously to the NPMs' market advantage." See id. at 699.[10]

Third, "[n]o evident economic force drives NPMs to the MSA." Id. at 697. Insofar as plaintiffs complained that NPMs faced a relative tax hardship because escrow payments, in contrast to MSA payments, are not tax deductible, plaintiffs ignored an important

---

[10] The district court also cited the "important public health goals and substantial fiscal benefits" of the MSA regime, Freedom Holdings VI, 492 F. Supp. 2d at 700, in concluding that it did not represent a "naked" restraint of trade lacking "'any redeeming virtue,'" id. at 696 (quoting Rice v. Norman Williams Co., 458 U.S. 654, 659 n.5 (1982)); see also Freedom Holdings III, 447 F. Supp. 2d at 248-54 (concluding per se rule should weigh social benefits of MSA).

For the reasons stated infra at **[22-35]**, we conclude that plaintiffs failed to prove their antitrust claim under a traditional application of the per se rule. Thus, we need not here decide whether a state's beneficent purpose can ever save an otherwise illegal restraint of trade from Sherman Act preemption. See National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978) (observing that "purpose of [antitrust] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry"); compare I Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 217b4, at 366-67 (3d ed. 2006) (criticizing Freedom Holdings III for effectively applying rule of reason and remarking that "[w]hether more or less cigarette smoking is healthy or unhealthy is an important policy concern, but it is not one that is properly effected through the device of an unsupervised cartel agreement"), with Daniel A. Crane, Harmful Output in the Antitrust Domain: Lessons from the Tobacco Industry, 39 Ga. L. Rev. 321, 326 (2005) (noting that antitrust enforcement in tobacco industry has traditionally focused on increasing output but suggesting different considerations for "net-harm industries").

15

distinction: MSA participants could "not recover their payments once made, while NPMs receive annual interest earnings on escrowed funds and will recover, after twenty-five years, any funds not applied to judgments or settlements with the States." Id. If plaintiffs eliminated these differences "by disclaiming their rights to interest income and reversion of principal," they would be "eligible to deduct their [escrow] payments." Id.

Fourth, plaintiffs failed to prove that the MSA "caused [them] or other NPMs to surrender pricing autonomy." Id. at 698. To the contrary, Christopher Nelson, chief financial officer of NPM Freedom Holdings, and Jeffrey Avo Uvezian, president of NPM International Tobacco Partners, testified that "their pricing decisions are made independently and that they are not compelled to follow price leadership by their larger competitors." Id. Similarly, Kevin Altman, who set prices for two NPMs, CigTec and JJA Distributors LLC, "testified that both companies made independent pricing decisions that were not dictated by OPMs or SPMs." Id. "The aggregate historical data" not only supported this testimony, it demonstrated that "NPMs have taken competitive advantage of higher prices charged by the large cigarette manufacturers." Id. "Only the Escrow Statutes," not the MSA, have an impact on "NPMs' cost structure." Id. Their effect, however, was akin to a "flat tax," which did not violate antitrust laws. Id. at 699.

### 2.    The Antitrust Claim

In light of these findings, the district court entered judgment for defendants on plaintiffs' antitrust claim, holding that plaintiffs had failed to carry their burden to prove a per se violation of the Sherman Act:

16

[T]he MSA does not mandate or authorize conduct that necessarily constitutes a violation of the antitrust laws in all cases, or place irresistible pressure on a party to violate the antitrust laws in order to comply with the [agreement]. The continued strength of NPMs proves as much, and the absence of financial pressure on NPMs to join the MSA confirms it. Nothing in the Escrow or Contraband Statutes mandates or authorizes illegal conduct in all cases, an essential ingredient of a per se antitrust violation.

Id. at 700 (internal quotation marks and modifications omitted).[11]

Alternatively, the district court concluded that the challenged statutes were shielded from Sherman Act preemption by state action immunity according to the two-part test articulated in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97. First, addressing the question of purpose that Freedom Holdings II determined could not be decided on the pleadings, the district court identified a "plausible nexus" between various provisions of the MSA and the states' twin goals of decreasing cigarette consumption and raising revenues to meet health costs associated with such consumption. Freedom Holdings VI, 592 F. Supp. 2d at 701. Second, the district court determined that New York actively supervised the competitive effects of the MSA by closely tracking data provided by the MSA auditor. See id. at 702. The district court identified no need for greater supervision in light of its findings that NPMs were able to gain market share under the challenged scheme. See id.

### 3. Commerce Clause Claim

The district court also entered judgment for defendants on plaintiffs' claim that the

---

[11] Accordingly, the district court also dissolved its preliminary injunction against enforcement of the allocable share release amendment to New York's Escrow Statute.

extraterritorial effects of "interlocking" state escrow statutes violate the Commerce Clause by creating a uniform, national system of cigarette regulation. While the enactment of similar escrow statutes by a number of states contributed to the national increase in cigarette prices, the district court concluded that this did not equate to regulation of interstate commerce by New York because plaintiffs failed to show that "commercial actors outside New York are bound in some way by the dictates of New York statutes." Id. at 707.

Plaintiffs timely appealed the district court's judgment.

## II.    Discussion

### A.    Standard of Review

On appeal from a bench trial, we accord considerable deference to a district court's findings of fact, which we will reverse only for clear error. We review its conclusions of law, or mixed fact and law, de novo. See Skoros v. City of New York, 437 F.3d 1, 12 (2d Cir. 2006). We may affirm the district court's decision on any ground appearing in the record. See Liberty Mut. Ins. Co. v. Hurlbut, 585 F.3d 639, 648 (2d Cir. 2009).

### B.    Antitrust Claim

In challenging the trial judgment, plaintiffs submit, as they have throughout this litigation, that the Sherman Act preempts New York's Escrow and Contraband Statutes because those laws "implement[] the illegal per se output cartel set up in the MSA." Second Supp. & Am. Compl. Prayer for Relief ¶ 2. As we recognized in Freedom Holdings I, 357 F.3d at 222-23, a two-step inquiry guides analysis of this claim.

First, the party asserting preemption must demonstrate an "irreconcilable conflict"

between the challenged statute and the Sherman Act.  Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982).  Such a conflict will be found only "when the conduct contemplated by the statute is in all cases a per se violation" of the antitrust laws.  Id. at 661; accord Freedom Holdings I, 357 F.3d at 223.  Only "manifestly anticompetitive" restraints "lack[ing] any redeeming virtue" – e.g., if competitors privately agree among themselves to fix prices or to divide markets – constitute such per se violations.  Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886-87 (2007) (internal quotation marks and ellipsis omitted).

By contrast, restraints "unilaterally imposed by government . . . to the exclusion of private control" do not violate the antitrust laws.  Fisher v. City of Berkeley, 475 U.S. 260, 266 (1986); accord Massachusetts Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d 560, 563 (1st Cir. 1999) (Boudin, J.).  Where, however, state law does not regulate unilaterally but, rather, grants private actors a degree of regulatory control over competition, the statute may be preempted as a "hybrid" restraint on trade.  See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 345-46 & n.8 (1987); accord Freedom Holdings I, 357 F.3d at 223; see also I Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ("Areeda & Hovenkamp"), ¶ 217a, at 352 (3d ed. 2006).  The touchstone at the first step of inquiry is, therefore, whether the challenged New York statutes "'mandate[] or authorize[]'" private antitrust violations.  Fisher v. City of Berkeley, 475 U.S. at 265 (quoting Rice v. Norman Williams Co., 458 U.S. at 661).

Second, even if plaintiffs showed that the challenged statutes mandate or authorize

19

a per se antitrust violation, those laws might still be saved from preemption by the doctrine of state action immunity, see Parker v. Brown, 317 U.S. 341 (1943), if the anti-competitive conduct at issue is both "clearly articulated and affirmatively expressed as state policy" and "actively supervised by the State itself," California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 105 (internal quotation marks omitted). In making this determination, our concern is not with whether the challenged statutes benefit consumers. See Rice v. Norman Williams Co., 458 U.S. at 659 ("A state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect."). The critical question is whether the statutes reflect actual state policy outside the purview of the Sherman Act, see Parker v. Brown, 317 U.S. at 351, or whether the state has merely "cast[] . . . a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement," in which case preemption will follow, California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 106.[12]

---

[12] Some courts and commentators have observed that the two steps of inquiry may overlap. See, e.g., Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 887-88 (9th Cir. 2008). To determine whether a statute mandates or authorizes a per se violation, a court must consider whether the challenged restraint "ha[s] been unilaterally imposed by government." Fisher v. City of Berkeley, 475 U.S. at 266. A finding of unilateral imposition "effectively merge[s]" into the state action immunity inquiry insofar as it concludes that the challenged statute does not delegate any unsupervised discretion to private parties. Costco Wholesale Corp. v. Maleng, 522 F.3d at 887; see also I Areeda & Hovenkamp, supra, ¶ 217d, at 372 (noting that Fisher "use[d] Parker to show that the [challenged] ordinance passed the Rice test"); Merrick B. Garland, Antitrust and State Action: Economic Efficiency and the Political Process, 96 Yale L.J. 486, 507 (1987) (suggesting that Fisher's "preemption analysis collapses into the Midcal test"). Likewise, "the 'state action' exemption from the antitrust laws simply expresses the conclusion that certain state laws are not preempted." I Areeda & Hovenkamp, supra, ¶ 217d, at 370.

On appeal, plaintiffs rely heavily on our decisions in <u>Freedom Holdings I</u> and <u>Freedom Holdings II</u> in arguing that the district court erred at both steps of the preemption analysis. When we reviewed the dismissal of plaintiffs' complaint in <u>Freedom Holdings I</u> and <u>Freedom Holdings II</u>, however, plaintiffs were required only to demonstrate that they could prove some set of facts in support of their claim. See <u>Freedom Holdings I</u>, 357 F.3d at 215 ("A complaint cannot be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).[13] After a trial judgment in favor of defendants, plaintiffs must be able to point to record evidence that precluded the district court from finding, as it did, that the challenged statutes are unilateral state actions that do not mandate or authorize private parties to restrain trade or, in any event, that the statutes are not subject to Sherman Act preemption by virtue of the state action immunity doctrine. We conclude that the district court was not precluded from making either determination.

1.  <u>Plaintiffs' Claim of a *Per Se* Violation of the Sherman Act</u>

    a.  <u>Plaintiffs Must Demonstrate Antitrust Injury from the Challenged Statutes</u>

Plaintiffs argue that they proved a <u>per se</u> violation of the Sherman Act by showing that

---

[13] After <u>Freedom Holdings I</u> and <u>Freedom Holdings II</u>, the Supreme Court articulated a "plausibility" standard for reviewing the dismissal of a complaint. See <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

"the MSA constructed an output cartel," Appellants' Br. at 57, and the Escrow and Contraband Statutes "conscript[] NPMs into the cartel as involuntary members," id. at 58. Plaintiffs contend that because they demonstrated such a per se violation, they were not required to adduce direct evidence of the challenged statutes' actual anti-competitive effects. See National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 109 (1984) ("[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" (quoting National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978)). Even if such evidence were required, plaintiffs submit that they proved that the MSA has eliminated NPM competition, has preserved the market share of participating manufacturers, and has allowed participating manufacturers to maintain supra-competitive prices.

At the outset, we note that plaintiffs do not challenge the MSA directly in making their per se argument. Nor could they. Section 16 of the Clayton Act affords injunctive relief only to plaintiffs who suffer "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. While a conspiracy among MSA participating manufacturers to fix prices or to divide the cigarette market among themselves would certainly violate the antitrust laws, see United States v. Topco Assocs., Inc., 405 U.S. 596 (1972); United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940), such a violation would not threaten plaintiffs with loss or damage. To the contrary, if NPMs are not penalized for increasing market share, they can maintain lower prices and thereby benefit from the alleged anti-

22

competitive effects of the MSA.  See Sanders v. Brown, 504 F.3d 903, 911 (9th Cir. 2007)

("If the OPMs really are charging artificially high prices, and thus making artificially high

profits, an NPM conceivably could compete on price by charging a 'normal' price and still

make a 'normal' profit, even taking the escrow payment into account.").  Thus, because the

law is well established that competitors lack standing to challenge a conspiracy by their rivals

to raise their own prices, see Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328,

337 (1990); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582-83 (1986),

in analyzing plaintiffs' appeal from the trial judgment, we ask whether they proved a per se

antitrust injury attributable to the challenged statutes.[14]

---

[14] The district court suggested that this rule is limited to antitrust plaintiffs who seek treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and that standing analysis is more flexible when an antitrust plaintiff seeks injunctive relief.  See Freedom Holdings VI, 592 F. Supp. 2d at 693-95.  We disagree.

In the antitrust context, courts have articulated several "efficient enforcer" factors to avoid the "duplicative recoveries" that would result from allowing "every person tangentially affected by an antitrust violation" to sue for treble damages.  Blue Shield of Va. v. McCready, 457 U.S. 465, 475-77 & n.11 (1982); see also Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n.14 (1972); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 443-44 (2d Cir. 2005).  Because "one injunction is as effective as 100, and, concomitantly, . . . 100 injunctions are no more effective than one," Hawaii v. Standard Oil Co., 405 U.S. at 261, some of these factors are "not relevant" in suits for injunctive relief, Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111 n.6 (1986).

But suits for injunctive relief, no less than suits for damages, require a plaintiff to demonstrate an "injury in fact."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Morever, an antitrust plaintiff – whether seeking relief in law or equity – must demonstrate "antitrust injury," the more subtle details of which are not relevant here.  See Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. at 113; see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130 (1969) (holding that plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws"); Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006).  Matsushita holds that a "conspiracy by petitioners to charge higher than competitive prices . . . could not injure . .

b.	Plaintiffs' Failure To Prove that the Challenged Statutes Establish a Hybrid Restraint of Trade

Because section 1 of the Sherman Act proscribes only private party "contract[s], combination[s] . . . or conspirac[ies] in restraint of trade," 15 U.S.C. § 1, the threshold question at trial was whether the challenged statutes are unilateral acts of a state falling outside federal antitrust law.  As the Supreme Court explained in upholding a city ordinance setting rent ceilings in Fisher v. City of Berkeley, antitrust laws would prohibit private property owners from "voluntarily band[ing] together to stabilize rents in the city," but the local law involved no "concerted action."  475 U.S. at 266.  The Court ruled that "[a] restraint imposed unilaterally by government does not become concerted action within the meaning of the [Sherman Act] simply because it has a coercive effect upon parties who must obey the law."  Id. at 267.  Nor does a government restraint become concerted action because certain citizens benefit from it, see id. at 264 ("[T]he function of government may often be to tamper with free markets, correcting their failures and aiding their victims . . . ."), or even have urged it, cf. City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 375 (1991) (recognizing inevitability and desirability of public officials acting in response to private

_____

. competitors, [who] stand to gain from any conspiracy to raise the market price."  475 U.S. at 583 (emphasis added).  We construe this categorical pronouncement to apply equally to suits at law and equity.  See generally Local Beauty Supply, Inc. v. Lamaur, Inc., 787 F.2d 1197, 1204 (7th Cir. 1986) (applying Matsushita rule in concluding that plaintiffs seeking equitable relief must also show "antitrust injury").  As the Supreme Court has observed, "[i]t would be anomalous . . . to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred."  Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. at 112.

24

citizens' requests in rejecting argument for narrowing state action immunity).

As we recognized in Freedom Holdings I, however, there is a distinction between laws whose restraints are the product of unilateral state action and those whose restraints are "hybrid." 357 F.3d at 223-24 & n.17 (citing, e.g., Fisher v. City of Berkeley, 475 U.S. at 267-68). Hybrid restraints result when legislation confers a degree of regulatory power on private parties. See Fisher v. City of Berkeley, 475 U.S. at 268; Rice v. Norman Williams Co., 458 U.S. at 665 n.1 (Stevens, J., concurring in judgment). Thus, statutes that effectively mandate resale price maintenance have been preempted by federal antitrust law as hybrid restraints of trade. See 324 Liquor Corp. v. Duffy, 479 U.S. at 340 (invalidating New York retail pricing system that "permits wholesalers to set retail prices, and retail markups, without regard to actual retail costs"); California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 103 (invalidating legislation under which "wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers"); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 386 (1951) (invalidating Louisiana law providing that buyer would not resell except at price stipulated by vendor).[15]

On their face, the New York Escrow and Contraband Statutes mandate and enforce

---

[15] At the time these cases were decided, resale price maintenance was a per se violation of the Sherman Act. See Dr. Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373 (1911). Recently, the Supreme Court overruled Dr. Miles and held that resale price maintenance agreements should be judged under the rule of reason. See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. at 907. We need not here decide whether state-mandated resale price maintenance would survive preemption analysis after Leegin. See Areeda & Hovenkamp, supra, ¶ 217.1, at 7-9 (Supp. 2008). We cite the cases only as illustrative of hybrid restraints.

payments that, as in <u>Fisher</u>, are "unilaterally imposed by government . . . to the exclusion of private control."  475 U.S. at 266.  The Escrow Statute requires cigarette manufacturers to make per-cigarette payments to the state according to a statutorily specified formula.  <u>See</u> N.Y. Pub. Health Law § 1399-pp(2)(a).[16]  The Contraband Statute enforces these payment obligations by requiring cigarette manufacturers to certify their compliance with the Escrow Statute.  <u>See</u> N.Y. Tax Law § 480-b(1).  If no such certification is made, various state-imposed penalties follow.  <u>See id.</u> §§ 480-b(2), 481(1)(c), 1846.  None of these challenged provisions grants any regulatory control to private parties.

In reversing the dismissal of plaintiffs' complaint, we nevertheless concluded that plaintiffs stated a possible claim that the challenged statutes functioned as a hybrid restraint. <u>See Freedom Holdings I</u>, 357 F.3d at 216, 223-24.  In doing so, we credited, as we were then required to do, plaintiffs' allegation that "the function of the Escrow Statute is to coerce NPMs to join the MSA because the costs of compliance with the Escrow Statute are substantially higher than the costs of being an SPM." <u>Freedom Holdings II</u>, 363 F.3d at 152; <u>see</u> Compl. ¶ 20; Second Supp. & Am. Compl. ¶ 17.  We concluded that proof of this

---

[16] We recognize that NPM payments are released from the state escrow fund to the extent they exceed payments that an NPM would have made if it had joined the MSA as an SPM.  <u>See</u> N.Y. Pub. Health Law § 1399-pp(2)(b)(ii).  Assuming <u>arguendo</u> that the MSA does penalize gains in SPM market share, <u>see Freedom Holdings II</u>, 363 F.3d at 153, an argument might be made that this release provision penalizes similar gains in NPM market share and, therefore, evidences a hybrid restraint, <u>see</u> <u>KT&G Corp. v. Attorney Gen. of Okla.</u>, 535 F.3d 1114, 1130-31 (10th Cir. 2008).  Like the Tenth Circuit, however, we think that such a connection to the conduct of private parties "is too attenuated for this court to conclude that [the state has] delegated regulatory power to . . . private individuals." <u>Id.</u> at 1131.

26

allegation could, in turn, support an inference that the challenged statutes required a cigarette manufacturer "to become part of the market-sharing agreement set up by the MSA – i.e. it must not gain market share and it therefore cannot compete on price." Freedom Holdings II, 363 F.3d at 154. In sum, because the challenged statutes were alleged to force NPMs to join the MSA – which we assumed, at the pleading stage, discouraged participating manufacturers from gaining market share and competing on price – we concluded that plaintiffs might prove that the statutes operated as a hybrid "delegat[ion of] price-setting authority to the OPMs." Freedom Holdings II, 363 F.3d at 155.

On review of a challenged trial judgment, our focus necessarily shifts from what plaintiffs might plausibly prove to what the district court found they did – or did not – prove. Consistent with our obligation to view the evidence in the light most favorable to the challenged judgment, we accord great deference to the district court's resolution of evidentiary conflicts, its choices among competing inferences to be drawn from the evidence, and its decision as to what weight to assign particular evidence. See Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) ("In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." (internal quotation marks and citation omitted)); accord Siewe v. Gonzales, 480 F.3d 160, 167-68 (2d Cir. 2007). Plaintiffs cannot secure

27

reversal simply by demonstrating that the evidence could support inferences favorable to their claim. Rather, they must show that the evidence permitted no other inferences. See Anderson v. Bessemer City, 470 U.S. at 574 (holding that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

> (1) Plaintiffs' Failure To Prove that the Challenged Statutes Compelled NPMs To Join the MSA

The district court found that plaintiffs failed at trial to prove the linchpin of their hybrid restraint claim, i.e., that the severity of the escrow payments established by the challenged statutes coerced NPMs to join the allegedly anticompetitive MSA. Plaintiffs initially submitted that the relative severity of escrow payments was established by the fact that, unlike MSA payments, "they are non-deductible for tax purposes." Second Supp. & Am. Compl. ¶ 17; see Freedom Holdings II, 363 F.3d at 152. At trial, the district court found that escrow payments would be tax deductible if NPMs disclaimed their rights to interest and release. See Freedom Holdings VI, 592 F. Supp. 2d at 697; see also Freedom Holdings III, 447 F. Supp. 2d at 238-39. Plaintiffs do not challenge this determination on appeal.

Instead, they submit that the district court erred in further finding that NPMs not only do not pay substantially more under the Escrow Statute than they would pay if they joined the MSA; they pay less. See Freedom Holdings VI, 592 F. Supp. 2d at 691 (finding that, for sales above grandfathered thresholds, SPMs pay more than NPMs). Plaintiffs' attack is two-fold.

First, plaintiffs fault the district court for relying on data reflecting OPM settlement

28

payments nationwide, rather than data limited to states that joined the MSA. Plaintiffs assert that by including payments made to the four states that settled tobacco litigation before the MSA was executed, the data relied on by the district court inflated the cost of OPM payments by an aggregate of $1-2 billion per year. Specifically, plaintiffs contend that, in 2007, OPMs paid only $4.04 per carton to comply with the MSA, not $5.31 as found by the district court.

Second, plaintiffs submit that the data relied on by the district court was inflated because it included payments owed – but not paid – by SPMs and, further, failed to take into consideration smuggled cigarettes not reported by participating manufacturers. Plaintiffs assert that, between 2003 and 2008, SPMs have failed to pay approximately 13% of payments required by the MSA, either because those payments are disputed or because SPMs have simply defaulted on their MSA obligations.

Neither of these arguments persuades us that the district court committed clear error in rejecting plaintiffs' claim that the escrow payments coerce NPMs to join the MSA. A comparison of MSA and escrow payments is complicated by the fact that the former are calculated based on relative market share while the latter are based on a per-cigarette fee. See Freedom Holdings III, 447 F. Supp. 2d at 238. Nevertheless, plaintiffs' contention that OPMs paid only $4.04 per carton – compared to NPMs' escrow payment of $5.02 per carton – does not find support even in the data on which they rely. That data indicates that OPMs paid $4.52 per carton to comply with the MSA. Further, although plaintiffs fault the district court for adding $0.78 to the $4.52 figure to reflect OPMs' payments to the four states that settled outside the MSA, the alternative of dividing OPMs' payments to the MSA settling

29

states by cigarettes sold nationwide appears even less reliable. Also, while it is undisputed that some SPMs have not fully met their payment obligations under the MSA, the weight to be accorded this fact is debatable given that a number of NPMs appear also to have failed to satisfy their escrow obligations.

In these circumstances, the district court did not clearly err in finding that plaintiffs failed to carry their burden of proving that they were required to pay so much more under the escrow statutes than under the MSA that the challenged statutes effectively compelled them to join the MSA.

(2)     Plaintiffs' Failure To Prove that the Challenged Statutes Delegate Price-Setting Authority to OPMs

Plaintiffs submit that the challenged statutes nevertheless effect a hybrid restraint of trade because they maintain the higher cigarette prices set by manufacturers participating in the MSA. The record evidence did not compel the district court to so find.

There is no doubt that escrow fees were designed to neutralize the cost disadvantage experienced by MSA participants vis-à-vis NPMs. See MSA § IX(d)(2)(E). But that is hardly sufficient to demonstrate that the challenged statutes mandate or authorize MSA participants to exercise "unsupervised private discretion" to fix prices or to penalize gains in market shares. I Areeda & Hovenkamp, supra, ¶ 217b, at 356; see generally Massachusetts Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d at 565 ("What is centrally forbidden is state licensing of arrangements between private parties that suppress competition – not state directives that by themselves limit or reduce competition."

(emphasis in original)). Rather, as the district court correctly concluded, the statutes' effort to impose a roughly equivalent cost on NPMs to that borne by manufacturers participating in the MSA can be analogized to the imposition of a flat tax.

A tax increase, like any cost, will likely be passed on to consumers in the form of higher prices, but where, as here, the state alone imposes the increased cost, there is no private collusion implicating the antitrust laws. See Freedom Holdings VI, 592 F. Supp. 2d at 699 (citing Freedom Holdings I, 357 F.3d at 229, and Freedom Holdings II, 363 F.3d at 152). That competitors respond in similar ways to a tax they must all pay does not, by itself, manifest an agreement proscribed by the Sherman Act. See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993) (holding that "tacit collusion" of participants in oligopolistic market to raise prices in response to higher costs is "not in itself unlawful"); Williamson Oil Co. v. Philip Morris U.S.A., 346 F.3d 1287, 1314-15 (11th Cir. 2003) (explaining why lock-step price increases following MSA were insufficient evidence of price-fixing); see generally Donald F. Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals To Deal, 75 Harv. L. Rev. 655, 663 (1962) ("[C]onscious parallelism is devoid of anything that might reasonably be called agreement when it involves simply the independent responses of a group of competitors to the same set of economic facts . . . .").

In any event, the district court did not reject plaintiffs' price fixing argument simply in theory. It found it belied in fact by substantial testimonial and documentary evidence indicating that, even under the challenged statutes, NPMs have retained pricing autonomy,

31

which they have exercised to gain substantial market share at the expense of OPMs. See Freedom Holdings VI, 592 F. Supp. 2d at 698-99.

In urging us to identify factual error, see Appellant's Br. at 26-27 (maintaining that "Enforcement Statutes ha[ve] succeeded in crushing the NPMs"), plaintiffs submit that the district court's market share findings were clearly erroneous because Pricewaterhouse Coopers based these calculations, like its MSA payment data, on national market share without distinguishing between states that joined in the MSA and states that reached independent settlements. Plaintiffs cite data suggesting that amendments to the allocable share release provision of state escrow statutes have resulted in declining NPM market share since it peaked at 8.1% in 2003. This is not surprising as such amendments require NPMs to make escrow payments on a greater percentage of cigarettes sold than previously. Further, the district court reasonably determined that the 2004 decision by General Tobacco, the largest NPM, to join the MSA also explains the expansion of SPMs' total market share at the expense of the NPMs in the years thereafter. See Freedom Holdings VI, 592 F. Supp. 2d at 691 n.5. In any event, even if allocable share amendments have eroded the dramatic market share gains that NPMs realized in the immediate aftermath of the MSA, the same data indicates that NPMs have gained considerable overall market share from the 0.4% held at the time the MSA went into effect to the 5.4% held in 2007.

In short, we identify no error in the district court's determination that the allegations we accepted for purposes of reviewing the dismissal of plaintiffs' complaint – that the challenged statutes forced NPMs "to become part of the market-sharing agreement set up by

32

the MSA," where OPMs fixed and maintained inflated prices and penalized gains in market share, Freedom Holdings II, 363 F.3d at 154 – were not proved by plaintiffs at trial. Rather, we conclude that substantial evidence supported the district court's conclusion that the challenged New York statutes, although in furtherance of the MSA, do not manifest a hybrid restraint of trade because they do not mandate or authorize any private party to exercise anticompetitive regulatory authority. This decision is consistent with those of our sister circuits who have similarly rejected antitrust challenges to state escrow statutes in furtherance of the MSA. See Xcaliber Int'l Ltd. v. Attorney Gen. of La., 612 F.3d 368, 374-77 (5th Cir. 2010) (rejecting challenge to Louisiana statute); Grand River Enters. Six Nations, Ltd. v. Beebe, 574 F.3d 929, 936-39 (8th Cir. 2009) (rejecting challenge to Arkansas statute), cert. denied, 130 S. Ct. 2095 (2010); KT&G Corp. v. Attorney Gen. of Okla., 535 F.3d 1114, 1128-33 (10th Cir. 2008) (rejecting challenge to Kansas and Oklahoma statutes); Sanders v. Brown, 504 F.3d at 910-11 [9th Cir.] (rejecting challenge to California statutes), cert. denied, 128 S. Ct. 2427 (2008); Trident Int'l Corp. v. Kentucky, 467 F.3d 547, 554-58 (6th Cir. 2006) (rejecting challenge to Kentucky statutes). But cf. A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 247-54 (3d Cir. 2001) (holding MSA per se illegal output restriction, but defendants immune under Noerr-Pennington doctrine), cert. denied, 534 U.S. 1081 (2002).

We emphasize, however, the limited scope of our decision. Because plaintiffs have not proved that the challenged statutes coerce them to join the MSA or that the MSA otherwise injures them, they lack standing to challenge provisions of the MSA that they

allege constitute an illegal agreement to divide the cigarette market among participating manufacturers. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 582-83. Thus, we have no occasion here to consider whether the MSA constitutes a private agreement that impermissibly restrains trade by penalizing SPMs when they gain market share from OPMs. See Freedom Holdings II, 363 F.3d at 153; Freedom Holdings VI, 592 F. Supp. 2d at 698 & n.15; Freedom Holdings III, 447 F. Supp. 2d at 258. Nor need we address defendants' arguments that MSA payments "do not change materially based on volume sold" or that the SPM payment formula "maintains a largely constant per-carton payment no matter how much market share the SPMs acquire." Appellees' Br. at 39 n.9 (emphasis added). We hold simply, in light of the district court's findings, that plaintiffs failed to prove that the challenged statutes granted regulatory power to private parties in violation of the antitrust laws that caused plaintiffs any injury.

2.     The Sherman Act Does Not Apply to the Challenged Statutes Because They Manifest "State Action"

In Parker v. Brown, 317 U.S. 341, the Supreme Court construed the Sherman Act to proscribe only private, not state, action. Because the Court grounded its ruling in the absence of a clear statutory statement of Congress's intent to preempt state regulation, see id. at 351, courts and commentators have concluded that the decision rests on "principles of federalism and state sovereignty," Patrick v. Burget, 486 U.S. 94, 99 (1988); see also IA Areeda & Hovenkamp, supra, ¶ 221b, at 48 (noting that Parker "was deemed necessary to protect the states' coordinate role in government"). Thus, "the premise of Parker v. Brown is that

34

federal courts in applying the antitrust laws, should assume that Congress accepted the risks of state-authorized displacement of competition." Cine 42nd St. Theater Corp. v. Nederlander Org., Inc., 790 F.2d 1032, 1049 (2d Cir. 1986) (Newman, J., concurring) (citation omitted).

Parker cautioned, however, that a state cannot "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351. In its simplest form, this means that "a state cannot shield private parties from the federal antitrust laws by enacting a statute saying no more than that [competitors] may agree to fix prices." Massachusetts Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d at 563-64. As Justice Powell famously stated, "[t]he national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 106.

From these principles, we can conclude that a state's own actions are not subject to antitrust preemption. See Hoover v. Ronwin, 466 U.S. 558, 568 (1984). But when private parties participate in anti-competitive conduct purportedly authorized by state action, a closer question arises. See id.; FTC v. Ticor Title Ins. Co., 504 U.S. 621, 633 (1992). Such conduct is shielded from antitrust liability only if it is "clearly articulated and affirmatively expressed as state policy" and "actively supervised by the State itself." California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 105 (internal quotation marks omitted).

Our conclusion that plaintiffs failed to prove that New York's Escrow and Contraband Statutes authorize Sherman Act violations obviates the need for detailed analysis of whether their alleged anti-competitive aspects are clearly articulated, affirmatively expressed, or actively supervised. See Freedom Holdings I, 357 F.3d at 223; IA Areeda & Hovenkamp, supra, ¶ 221a, at 42. Indeed, Hoover suggests that "anticompetitive conduct performed entirely by state actors, without any private involvement, . . . effectively satisfie[s] the Midcal supervision requirement." Freedom Holdings I, 357 F.3d at 232 n.27. A number of our sister circuits have relied on Hoover to hold that the MSA and statutes enacted in furtherance of it constitute unilateral state action exempt from the application of the antitrust laws. See Xcaliber Int'l Ltd. v. Attorney Gen. of La., 612 F.3d at 378-80 & n.11 [5th Cir.]; Grand River Enters. Six Nations, Ltd. v. Beebe, 574 F.3d at 939-41 [8th Cir.]; Sanders v. Brown, 504 F.3d at 914-19 [9th Cir.]. While we generally agree with this approach, we nevertheless apply the Midcal test "out of an abundance of caution" to explain why we reject plaintiffs' argument that the district court erred in finding the challenged statutes to constitute state action immune from antitrust preemption. Costco Wholesale Corp. v. Maleng, 522 F.3d 874, 888 (9th Cir. 2008).

At the outset, we observe that the nature of the clear articulation and active supervision required by Midcal necessarily varies with the nature of the challenged restraint. Thus, state authorization is sufficiently clear when "the legislature contemplated the kind of action" challenged. City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 415 (1978) (plurality opinion) (internal quotation marks omitted). Likewise, "the active supervision

36

requirement mandates that the State exercise ultimate control over the challenged anticompetitive conduct." Patrick v. Burget, 486 U.S. at 101. When, in Freedom Holdings I, we concluded that New York had not sufficiently articulated "why the market-share provisions are needed to effectuate state policy goals," 357 F.3d at 228, or actively supervised "the pricing decisions within the allegedly-anticompetitive market structure enforced by the Contraband Statutes," id. at 231, we relied on plaintiffs' allegations that the challenged statutes coerced NPMs into joining the MSA, under which OPMs exercised effective authority to fix prices and control market shares. Because plaintiffs failed to prove these allegations at trial, however, their claim reduces to a challenge to what is effectively a flat tax whose only arguably "anti-competitive" effect is to raise cigarette prices.

> a. The Creation of an Escrow Fund and Enforcement of Payment Obligations Are Clearly Articulated and Affirmatively Expressed as State Policy

Midcal's clear articulation/affirmative expression requirement "ensure[s] that state action immunity is afforded only to actions taken by the state." Id. at 227. In Freedom Holdings I, we easily concluded that the entire MSA scheme satisfied this requirement because "agreement to the MSA by the New York Attorney General, approval of it by a New York court, and passage of the [Escrow and] Contraband Statutes were express acts of the State of New York." Id. (footnote omitted). At the same time, we suggested that the requirement also serves the "ancillary purpose" of revealing whether "the State's policy goals are sufficient to qualify for the Parker immunity," observing that "simply protecting private parties from competition is not a sufficient goal." Id. at 227 (citing Parker v. Brown, 317

37

U.S. at 351-52). Although we did not think that matter could be resolved at the pleading stage, see id. at 216, we doubted "that a federal court would upset a state statute solely because it failed to meet the explanatory aspect of the first Midcal prong," id. at 227. Indeed, we later clarified that our initial rejection of state action immunity in Freedom Holdings I "expressly relied on the challenged scheme's failure to meet the second Midcal prong." Freedom Holdings II, 363 F.3d at 157.

Now, after trial, with plaintiffs having failed to prove that the challenged statutes operated as anything more than a flat tax, we can conclude that the record permitted the district court to find even the ancillary purpose of the first Midcal requirement satisfied.[17] As we observed in Freedom Holdings I, a flat tax, far from "shelter[ing] private parties from the Sherman Act solely in order [for the state] to share monopoly profits," 357 F.3d at 230, would bear a sufficient nexus to policy goals of deterring smoking and raising revenue for tobacco-related health expenses to justify Parker immunity, see id. at 229. These goals are expressly articulated in the Escrow Statute, which references the "serious public health concerns" posed by cigarettes, N.Y. Pub. Health Law § 1399-nn(1); the "serious financial concerns for the state" in having to fund related health-care programs, id. § 1399nn(2)-(4);

_____

[17] We have no occasion to consider whether, to the extent a different plaintiff might have standing to challenge the MSA as distinct from the Escrow and Contraband Statutes, New York could offer a justification for any alleged market division among MSA participants to satisfy the ancillary purpose of the first Midcal requirement. See Freedom Holdings III, 447 F. Supp. 2d at 258 (observing that "increased marginal costs to the SPMs above the grandfathered levels can be viewed as a means of recouping those funds which were lost to the states through the grandfather provision").

and the MSA requirement that cigarette manufacturers "pay substantial sums to the state," id. § 1399-nn(5). Thus, the state determined that it was in its interest "to require that [NPMs] establish a reserve fund to guarantee a source of compensation [for cigarette-related injuries caused by their products] and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise." Id. § 1399-nn(6). There is a sufficient nexus between these identified purposes and the required escrow payments to preclude us from second-guessing the state's choice of means to achieve its articulated policy. See Freedom Holdings I, 357 F.3d at 229; accord Massachusetts Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d at 565; cf. Freedom Holdings II, 363 F.3d at 156 (questioning state's ability to refute hypothetical antitrust challenge to statute authorizing price fixing of car washes by assertion that law would improve performance of state symphony).

Plaintiffs do not dispute that the challenged statutes clearly articulate and affirmatively express state policy. Nor do they challenge the state's ability to pass laws addressing health concerns associated with smoking. Rather, they submit that defendants cannot satisfy the ancillary explanatory purpose of Midcal because the MSA requires states to become "active participants in the cartel." Appellants' Br. at 68. Specifically, they contend that the NPM adjustment, which provides a substantial incentive for states to pass escrow laws, removes the challenged statutes from the scope of Parker immunity. We disagree.

In Parker, the Supreme Court observed that there was "no question of the state or its municipality becoming a participant in a private agreement or combination by others for

39

restraint of trade," and that the challenged statute "made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly." 317 U.S. at 351-52. While some courts had read this language to establish an exception to Parker immunity when private parties "conspired" with the government to pass laws restraining trade, see, e.g., Whitworth v. Perkins, 559 F.2d 378 (5th Cir. 1977), the Supreme Court has since foreclosed this argument by holding that "[t]here is no such conspiracy exception," City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. at 374-75 (observing that quoted language from Parker "should not be read to suggest the general proposition that even governmental regulatory action may be deemed private – and therefore subject to antitrust liability – when it is taken pursuant to a conspiracy with private parties" (emphasis in original)). The Supreme Court observed that "[t]he impracticality of such a principle is evident if, for purposes of the exception, 'conspiracy' means nothing more than an agreement to impose the regulation in question." Id. at 375. Here, the NPM adjustment reflects, at most, the sort of agreement to take regulatory action that the Supreme Court has held insufficient, by itself, to deprive state action of Parker immunity. See also id. at 376 (rejecting proposed exceptions to state action immunity even for government "corruption" or "abandonment of public responsibilities to private interests").

Perhaps recognizing that City of Columbia precludes our recognition of a conspiracy exception, plaintiffs urge us to conclude that the settling states, through the MSA, "engage[d] in interstate commerce as commercial participants." Appellants' Reply Br. at 27. While the possibility of a market participant exception is left open in City of Columbia, 499 U.S. at

40

374-75, 379, the trial record does not support its application here. New York neither manufactures nor distributes cigarettes in the market. See id. at 374-75; cf. IA Areeda & Hovenkamp, supra, ¶ 221, at 49 (noting that City of Columbia suggests that private price-fixing conspiracy "is not immunized because one of the producers is state-owned"). New York simply regulates certain manufacturers, requiring them to make specified payments so that "the state will have an eventual source of recovery from them if they are proven to have acted culpably." N.Y. Pub. Health Law § 1399-nn(6). Whatever the policy arguments for or against such legislation, it does not render the state a market participant subject to antitrust liability.

    b.  The Flat Tax Imposed and Enforced by the Challenged Statutes Is Actively Supervised by the State

Having concluded that the challenged statutes are clearly articulated and affirmatively expressed as state policy, we now consider whether they are actively supervised by the state. In Freedom Holdings I, we concluded that the state could not satisfy this requirement at the pleading stage because "[n]either the New York statutes, the MSA, nor any other New York law or regulation 'actively supervise[s]' the pricing decisions within the allegedly-anticompetitive market structure enforced by the Contraband Statutes." 357 F.3d at 231 (second alteration in original); accord Freedom Holdings II, 363 F.3d at 157 (observing that it was "too soon to say whether the state will ultimately be able to elicit evidence sufficient to meet this second prong"). We now consider the state's supervision of the challenged statutes in light of plaintiffs' trial failure to prove that the challenged statutes impose

anything more anti-competitive than a flat tax on NPMs, and we conclude that the district court reasonably found the second Midcal requirement satisfied.

The active supervision required to secure state action immunity necessarily depends on the facts of each case. As noted supra at **[25-26]**, the laws challenged in Midcal and 324 Liquor effectively allowed one private party to set the prices charged by another private party. See 324 Liquor Corp. v. Duffy, 479 U.S. at 340; California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 103. Thus, the Supreme Court's determination that the state did not actively supervise the challenged programs in those cases relied on the fact that the state "'neither establishes prices nor reviews the reasonableness of the price schedules.'" 324 Liquor Corp. v. Duffy, 479 U.S. at 345 (quoting California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. at 105). By contrast, in this case, the state itself determines the increased cost to NPMs attributable to escrow payments. See N.Y. Pub. Health Law § 1399-pp(2).

This case is thus more akin to the situation distinguished by the Court in 324 Liquor Corp., when it observed that a "simple 'minimum markup' statute . . . may satisfy the 'active supervision' requirement." 479 U.S. at 344 n.6. In support, the Court cited Morgan v. Division of Liquor Control, 664 F.2d 353 (2d Cir. 1981), in which this court upheld Connecticut's alcohol markup statute. In Morgan, we emphasized that the active supervision test was met by the state's "structuring a detailed mechanism for determining prices for alcoholic beverages." Id. at 356. The critical difference then is that, in one case, a private party sets the minimum resale price (without state input or supervision) while, in the other,

42

the state supplants normal market mechanisms only to the extent it mandates the markup. In the latter circumstance, "although the hypothetical statute could eliminate price competition among retailers, that would result from the choice of the state rather than from the choice of the wholesaler. Similarly, the amount of the minimum markup would be determined by the state, not by the wholesaler . . . . Accordingly, there would be nothing to supervise." IA Areeda & Hovenkamp, supra, ¶ 226e, at 194; see also Costco Wholesale Corp. v. Maleng, 522 F.3d at 899 (upholding minimum markup on this ground).

Here, plaintiffs' antitrust argument reduces to a claim that the challenged statutes, by raising their costs, have the effect of raising cigarette prices. It is undeniably the state, however, that determines the cost increase by fixing the required escrow payments. See, e.g., N.Y. Pub. Health Law § 1399-pp(2)(a)(v) (requiring NPMs to contribute "for each of 2007 and each year thereafter: $.0188482 per unit sold"); cf. Morgan v. Div. Liquor Control, 664 F.2d at 356 (referencing state's "detailed mechanism for determining prices"). Thereafter, normal market mechanisms function. Indeed, as plaintiffs acknowledged at oral argument, NPMs can charge whatever price they wish, as long as they make the specified escrow payments. Thus, like the hypothetical minimum markup in 324 Liquor, the increase in cigarette prices attributable to the challenged statutes "result[s] from the choice of the state rather than from the choice of" cigarette manufacturers. IA Areeda & Hovenkamp, supra, ¶ 226e, at 194. Accordingly, because the statute specifies the exact component of the inflated price attributable to the state, "there is nothing that the state can 'actively supervise' except to see that the statutory requirements are obeyed – and there is no claim that the state has

43

neglected this." Battipaglia v. N.Y. State Liquor Auth., 745 F.2d 166, 176 (2d Cir. 1984) (Friendly, J.); see also IA Areeda & Hovenkamp, supra, ¶ 226e, at 194.

Plaintiffs do not dispute that the state has engaged in this form of supervision. Indeed, the record shows that the state (1) reviews audit reports detailing the competitive effects of the MSA and challenged statutes, and (2) has responded to these reports by enacting (a) the Contraband Statute and (b) the allocable share release amendment. Rather, characterizing the state as an "active participant[] in [a] commercial enterprise," plaintiffs maintain that it would be "paradoxical" for us to conclude that the state's active enforcement of the Escrow Statute satisfies the active supervision prong because, they claim, the statute "is the primary tool for insulating the [participating manufacturers] from consumer oriented price competition." Appellants' Reply Br. at 29. We are not persuaded.

As the Supreme Court noted in rejecting a conspiracy exception to Parker immunity, "it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them." City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. at 375. Depending on which party's brief one reads, the purpose and effect of the challenged legislation is either to "destroy" NPMs or "to level the playing field." Compare Appellants' Br. at 22, with Appellees' Br. at 12, 50, 51 n.13. A federal court cannot, however, use the antitrust laws to "second-guess[]" clearly articulated, properly supervised state policy judgments. Freedom Holdings I, 357 F.3d at 229; Massachusetts Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n, 197 F.3d at 565. The purpose of Midcal analysis is simply to ascertain "whether anticompetitive conduct engaged in by private

44

parties should be deemed state action" immune from antitrust laws. Patrick v. Burget, 486 U.S. at 100. Thus, plaintiffs' intimation that the challenged statutes have harmed them is not relevant to a court's determination of whether it is the state itself that has imposed the very restraint about which they complain and satisfactorily supervised its operation. See Hoover v. Ronwin, 466 U.S. at 567-68. Accordingly, we conclude that the trial record supports a finding that New York's control and active enforcement of escrow payment obligations satisfies the second Midcal requirement.

Once again, we note the limited reach of our ruling, which does not foreclose challenges to other potentially anti-competitive conduct in the tobacco industry. In this regard, our decision is consistent with that of the Third Circuit in Bedell, on which Freedom Holdings I relied to conclude that the state had not satisfied the active supervision requirement at the pleading stage. The Bedell plaintiffs were a class of cigarette wholesalers – not NPMs – who claimed to suffer losses because the major tobacco companies "imposed artificially high prices on direct purchasers." 263 F.3d at 247 (internal quotation marks omitted). The Third Circuit concluded that such plaintiffs had standing to challenge the restraints imposed by the MSA itself, specifically the SPM pricing formula for allegedly penalizing gains in market share. See id. In this case, where plaintiffs' claim of antitrust injury derives from the Escrow and Contraband Statutes, see supra at **[22-24 & n.14]**, we hold simply that the district court reasonably concluded from the trial evidence that those legislative enactments of state policy neither mandate nor authorize private parties to exercise unsupervised power to restrain trade.

45

C. Commerce Clause Claim

The Constitution's affirmative grant of power to Congress "[t]o regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, has long been construed to imply a negative counterpart, commonly referred to as the dormant Commerce Clause, restraining state authority over interstate commerce, see, e.g., United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth, 550 U.S. 330, 338 (2007); American Trucking Ass'ns v. Mich. Pub. Serv. Comm'n, 545 U.S. 429, 433 (2005). In appealing the district court's rejection after trial of their dormant Commerce Clause challenge to New York's Escrow and Contraband Statutes, plaintiffs do not contend – nor could they – that these laws discriminate against interstate commerce either facially or in incidental effect. See Freedom Holdings I, 357 F.3d at 217-19; see also Wyoming v. Oklahoma, 502 U.S. 437, 454-55 (1992); Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). Instead, they submit that the district court erred in failing to hold the statutes invalid because the combined extraterritorial effects of (1) forty-six state escrow statutes, (2) forty-four contraband statutes, and (3) forty-four amended allocable share release provisions practically result in national regulation of cigarette prices, which "may not be accomplished piecemeal through the extraterritorial reach of individual state statutes." Healy v. Beer Inst., 491 U.S. 324, 340 (1989); accord Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d at 171.[18]

_____

[18] A court may analyze a claim that a state statute is invalid because it regulates commerce extraterritorially either as a disproportionate burden on commerce under the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. at 142, or, as plaintiffs' claim requires here, "independently . . . as a question of regulatory jurisdiction rather than one of

In support, plaintiffs rely heavily on our decision in Grand River, which recognized a possible claim by a different group of NPMs: "that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states." 425 F.3d at 173. We took "no position as to the ultimate viability" of a dormant Commerce Clause challenge to the alleged arrangement. Id. Rather, we concluded that "not dismissing this claim at the pleading stage is consistent with the district court's decision to reinstate the Sherman Act claim, which alleged that the MSA and interrelated statutes restrained trade and affected market prices." Id. In so holding we noted that the Grand River complaint alleged facts not pleaded in Freedom Holdings I: "that the [challenged statutes] are inconsistent with the legitimate regulatory regimes of other states, that [they] force out-of-state merchants to seek New York regulatory approval before undertaking an out-of-state transaction, or that any sort of interstate regulatory gridlock would occur if 'many or every' state adopted similar legislation." Id. at 171 (quoting Freedom Holdings I, 357 F.3d at 221). Although plaintiffs amended their complaint to conform with Grand River, they developed little evidence at trial to support the three allegations noted in that case. Nor do they offer much by way of analysis on appeal as to how the challenged statutes fall into any of the three categories. They simply label state statutes an "interlocking grid" and assume that judicial condemnation will follow

_____

regulatory discrimination," Freedom Holdings I, 357 F.3d at 216 n.11 (citing Healy v. Beer Inst., 491 U.S. at 336, and Edgar v. MITE Corp., 457 U.S. 624, 643 (1982) (plurality opinion) ("The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, any attempt directly to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." (internal quotation marks omitted)).

47

under the Commerce Clause.  Appellants' Br. at 55, 57; see also id. at 5, 53, 56; Appellants'

Reply Br. at 3, 6.  Like the district court, we are not persuaded.

Two Supreme Court decisions provide useful guidance in reviewing Commerce Clause challenges to "interlocking" state statutes.  First, in Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573 (1986), the Court invalidated a provision of New York's Alcoholic Beverage Control Law requiring distillers to affirm that the schedule of prices filed in New York "is no higher than the lowest price at which such item of liquor will be sold . . . anywhere in any other state of the United States" during the month covered by the schedule, id. at 576.  Under the challenged law, the New York Liquor Authority prohibited payments of promotional allowances to wholesalers, a practice allowed in other states.  See id. at 577-78.  The New York Liquor Authority could "for good cause" permit distillers to change their posted prices.  Id. at 582 n.5.  The Court held that the "practical effect" of the challenged regulatory regime was to "control liquor prices in other States" because, once a distiller posted prices in New York, it could not lower prices elsewhere in the country without obtaining New York's "regulatory approval." Id. at 582-83. Further, the Court noted that "the proliferation of state affirmation laws . . . has greatly multiplied the likelihood that a seller will be subjected to inconsistent obligations in different States." Id. at 583.  Because New York's position on promotional payments was inconsistent with that of other states, New York effectively forced Brown-Forman "to abandon its promotional allowance program in States in which that program is legal." Id. at 584.

In Healy v. Beer Institute, 491 U.S. 324, the Supreme Court invalidated a Connecticut

48

law requiring beer shippers to affirm that their posted prices were no higher than prices in border states. Connecticut further made it unlawful to sell beer in that state at a price higher than that charged in bordering states during the month covered by the posting. See id. at 329. The Court held that "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." Id. at 336. Noting that Massachusetts required brewers to post prices a month before they took effect, the Supreme Court concluded that the Connecticut law had the practical effect of requiring a brewer "on January 1, when [he] posts his February prices for Massachusetts, [to] take account of the price he hopes to charge in Connecticut during the month of March." Id. at 338. If the border states "each enacted statutes essentially identical to Connecticut's," the problem was only compounded:

> Under those circumstances, in January, when a brewer posts his February prices in Connecticut and the border States, he must determine those prices knowing that the lowest bottle, can, or case price in any State would become the maximum bottle, can, or case price the brewer would be permitted to charge throughout the region for the month of March. This is true because in February, when the brewer posts his March prices in each State, he will have to affirm that no bottle, can, or case price is higher than the lowest bottle, can, or case price in the region – and these "current" prices would have been determined by the January posting. Put differently, unless a beer supplier declined to sell in one of the States for an entire month, the maximum price in each State would be capped by previous prices in the other States. This maximum price would almost surely be the minimum price as well, since any reduction in either State would permanently lower the ceiling in both.

Id. at 339-40. The Court described this scenario as "price gridlock." Id. at 340.

49

Applying these principles to the challenged statutes, we conclude that plaintiffs failed to prove any similar gridlock here. By its terms, the Escrow Statute "taxes" only cigarettes sold in New York. See N.Y. Pub. Health Law § 1399-oo(10) (defining "[u]nits sold" for purposes of Escrow Statute as "the number of individual cigarettes sold in the state" (emphasis added)); id. § 1399-pp(2) (specifying payments "per unit sold"); see also id. at § 1399-pp(2)(b)(ii) (releasing payments from escrow "to the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the [MSA] payments . . . that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer" (emphasis added)). Similarly, the Contraband Statute applies only to manufacturers "whose cigarettes are sold for consumption in this state." N.Y. Tax Law § 480-b(1) (emphasis added). Plaintiffs offered no evidence indicating that the practical effect of either of these statutes reaches beyond their terms to set minimum or maximum cigarette prices outside New York.

We recognize that escrow payments, like any tax, increase the cost of cigarettes. Unlike the statute struck down in Healy, however, nothing prevents manufacturers from recouping increased costs imposed by New York law from New York consumers. See National Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 110 (2d Cir. 2001) ("In cases like Healy, the state necessarily prevented firms from recouping any of the costs imposed by the state statute from the residents of the state itself. Here, the manufacturers remain free to charge higher prices only to Vermonters without risking violation of the statute."); see also Baldwin

50

v. G.A.F. Seelig, Inc., 294 U.S. 511, 521 (1935) (Cardozo, J.) (upholding injunction against enforcement of New York milk pricing statute because "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there"). In short, plaintiffs cannot show that the challenged statutes violate the Commerce Clause by "depriv[ing] businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market.'" Healy v. Beer Inst., 491 U.S. at 339 (quoting Brown-Forman Distillers Corp. v. N.Y. Liquor Auth., 476 U.S. at 580); accord SPGGC, LLC v. Blumenthal, 505 F.3d 183, 193 (2d Cir. 2007).

Further, while the enactment of similar escrow and contraband statutes in most states has caused cigarette prices to rise nationwide, such statutes impose no inconsistent obligations, which might evidence extraterritorial regulation proscribed by the Commerce Clause. See Brown-Forman Distillers Corp. v. N.Y. Liquor Auth., 476 U.S. at 583; see also CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 88-89 (1987) (identifying no inconsistency violating dormant Commerce Clause when multiple states regulate voting rights of corporations created under their law). Certainly, plaintiffs point to no provision of New York law requiring cigarette manufacturers to obtain the state's "regulatory approval" before selling or pricing cigarettes in other states. Brown-Forman Distillers Corp. v. N.Y. Liquor Auth., 476 U.S. at 582. Accordingly, plaintiffs failed to prove that the challenged statutes have any impermissible extraterritorial effect.

Grand River is not to the contrary. Drawing all reasonable inferences in those plaintiffs' favor at the pleading stage, we concluded that they had stated a colorable claim

51

"that the practical effect of the challenged statutes and the MSA is to <u>control</u> prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." 425 F.3d at 173 (emphasis added). Such control is not evidenced simply by coincident obligations which may produce parallel price increases among the states. In <u>Grand River</u>, however, we suggested that a factfinder might be able to infer control from the fact that the allocable share release provision, which refunds payments made by NPMs in excess of what they would have paid as SPMs under the MSA, might effectively require NPMs to pay a "national-market-share-dependent amount." <u>Id.</u> at 172.

Plaintiffs submit that <u>Grand River</u> compels us to reverse the district court's Commerce Clause decision because, under the amended allocable share release provision, escrow payments are still keyed, in part, to MSA payments, which in turn depend on national market share. We disagree. Plaintiffs adduced no evidence showing that the amended release provision has ever been invoked. Funds are released from escrow to the extent escrow payments exceed MSA payments, <u>see</u> N.Y. Pub. Health Law § 1399-pp(2)(b)(ii), but the district court reasonably found that, in practice, MSA payments exceed escrow payments. In the absence of contrary evidence, the district court was hardly compelled to conclude that NPM escrow payments will actually be released from the state escrow fund in amounts calculated by reference to national market share. <u>See</u> <u>International Tobacco Partners, Ltd. v. Kline</u>, 475 F. Supp. 2d 1078, 1090-91 (D. Kan. 2007). Thus, even if such an indirect reference to national market share could, in some cases, raise concerns under the dormant

Commerce Clause, plaintiffs simply have not proved that the challenged statutes have the practical effect of regulating commerce extraterritorially.

Ultimately, plaintiffs' Commerce Clause claim fails, as we said in Freedom Holdings I, because "[m]ere 'upstream pricing impact' is not a violation of the dormant Commerce Clause, even if the impact is felt out-of-state where the stream originates." Freedom Holdings VI, 592 F. Supp. 2d at 707 (quoting Freedom Holdings I, 357 F.3d at 220). Courts have consistently recognized that "[t]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." Osborn v. Ozlin, 310 U.S. 53, 62 (1940); see also Healy v. Beer Inst., 491 U.S. at 345 (Scalia, J., concurring) ("[I]nnumerable valid state laws affect pricing decisions in other States."); National Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d at 111 (noting that "it is axiomatic that the increased cost of complying with a regulation may drive up the sales price" and rejecting argument that such increased prices evidenced dormant Commerce Clause violation); National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1130-31 (7th Cir. 1995) (Easterbrook, J.) (observing that "almost every state and local law – indeed, almost every private transaction – affects interstate commerce" and warning that if dormant Commerce Clause applied to "all laws affecting commerce – that is, to all state and local laws addressing a subject that Congress could regulate, if it chose – then judicial review of statutory wisdom after the fashion of Lochner would be the norm"

(emphasis in original)).[19]

A number of our sister circuits have concluded that state escrow and contraband statutes do not regulate commerce extraterritorially in violation of the Commerce Clause. See S&M Brands, Inc. v. Caldwell, 614 F.3d 172, 177-78 (5th Cir. 2010); Grand River Enters. Six Nations, Ltd. v. Beebe, 574 F.3d at 943-44 [8th Cir.]; KT&G Corp. v. Attorney Gen. of Okla., 535 F.3d at 1143-46 [10th Cir.]; Star Scientific, Inc. v. Beales, 278 F.3d 339, 354-57 (4th Cir. 2002). We reach the same conclusion in this case. Plaintiffs having been afforded the opportunity to prove at trial that New York's Escrow and Contraband Statutes did, in fact, impermissibly regulate interstate commerce, and having failed to carry their burden, we affirm the judgment of the district court in favor of defendants.

## III. Conclusion

To summarize, we conclude as follows:

1.    The record evidence supports the district court's finding that plaintiffs failed

---

[19] Commentators have also cautioned that the Commerce Clause's ban on extraterritorial regulation must be applied carefully so as not to invalidate many state laws that have permissible extraterritorial effects. See generally Gillian E. Metzger, Congress, Article IV, and Interstate Relations, 120 Harv. L. Rev. 1468, 1521 (2007) ("[T]he extent of the prohibition on the states themselves should not be overstated. In practice, states exert regulatory control over each other all the time . . . . The prohibition on extraterritorial legislation is thus understood only to constrain a state from formally asserting legal authority outside its borders . . . ."); Mark D. Rosen, Extraterritoriality and Political Heterogeneity in American Federalism, 150 U. Pa. L. Rev. 855, 919-30 (2002) (arguing that ban on extraterritorial regulation applies only to protectionist laws, regulations of non-citizens, and inconsistent regulations); Jack L. Goldsmith & Alan O. Sykes, The Internet and the Dormant Commerce Clause, 110 Yale L.J. 785, 795 (2001) ("Innumerable state laws affect outsiders, and no one thinks that all (or even most) of these laws violate the dormant Commerce Clause.").

to prove that New York's Escrow and Contraband Statutes delegate any regulatory power to private parties. Accordingly, the district court properly concluded that the challenged statutes are not preempted by the Sherman Act.

2. The record evidence further supports the district court's determination that any potentially anti-competitive aspects of the New York Escrow and Contraband Statutes were clearly articulated and affirmatively expressed as state policy as well as actively supervised by the state itself, such that defendants qualified for state action immunity as recognized in Parker v. Brown, 317 U.S. 341.

3. Plaintiffs' failure to prove that the challenged statutes have an extraterritorial effect on commerce supports the district court's rejection of their dormant Commerce Clause challenge to the New York Escrow and Contraband Statutes.

AFFIRMED.